USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/21/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

International Business Machines Corporation

               Plaintiff,

-against-

Nagaseelan Naganayagam

               Defendant.

OPINION & ORDER
No. 15 Civ. 7991 (NSR)

NELSON S. ROMÁN, United States District Judge

Plaintiff International Business Machines ("IBM") brings this action against Defendant Nagaseelan Naganayagam ("Naganayagam") for breach of contract, alleging that it is due $112,260.81 for the value of rescinded stock options and equity awards previously given to Defendant—a former employee of IBM.

Presently before the Court is Plaintiff's motion for summary judgment and Defendant's cross-motion pursuant to Rule 37 of the Federal Rules of Civil Procedure for spoliation sanctions. For the reasons that follow, Plaintiffs' motion is GRANTED and Defendants' motion is DENIED.

## BACKGROUND

### I. Factual Background

The following undisputed facts are taken from the parties' respective Rule 56.1 statements,[1] affidavits, and exhibits submitted in support of their motions. Disputed facts along with the allegations made in the parties' operative pleadings will be discussed as relevant.

---

[1] The Court notes Defendant's letter dated January 24, 2017 requesting that the Court disregard Plaintiff's Reply to Defendant's Rule 56.1 Counterstatement of Material Facts. Because the facts derived from Plaintiff's original Rule 56.1 Statement of Facts, Defendant's Counterstatement of Facts, and the parties' exhibits were sufficient to reach a decision in this matter, the Court does not address the propriety of Plaintiff's subsequent submission.

IBM is an information technology corporation organized under the laws of the State of New York, with its headquarters and principal place of business in Armonk, New York. (Defendant's Local Civil Rule 56.1 Counterstatement of Material Facts ("Def.'s 56.1 Reply"), ¶ 1, ECF No. 62.) Defendant is a former employee of IBM who served as a Vice President in the Global Business Services Division of IBM Australia. (*Id.* ¶ 3.)

During the course of his employment at IBM, Defendant received long term incentive and equity awards under the terms and conditions of IBM's Long Term Performance Plan (the "Plan") and Equity Award Agreements dated June 8, 2009, June 8, 2010, June 8, 2011, and June 8, 2012 (collectively the "EAAs"). (*Id.* ¶¶ 5, 10.) Under the EAAs, Defendant was granted Restricted Stock Units ("RSUs"), which were scheduled to vest on later dates in accordance with his continued employment with IBM. (*Id.* ¶ 11.) Both the Plan and the various EAAs include terms for the possible cancellation and rescission of the awards granted to Defendant. (*Id.* ¶¶ 8, 14, 16.) Namely, Section 13(a) of the Plan states, in pertinent part:

> "[IBM] may cancel, rescind, suspend, withhold or otherwise limit or restrict any unexpired, unpaid, or deferred Awards at any time if the Participant . . . engages in any 'Detrimental Activity.' For the purposes of this Section 13, 'Detrimental Activity' shall include: (i) the rendering of services for any organization or engaging directly or indirectly in any business which is or becomes competitive with the Company, or which organization or business, or the rendering of services to such organization or business, is or becomes otherwise prejudicial to or in conflict with the interests of the Company.

(Decl. of Barbara M. Maisto in Supp. for Pl.'s Mot. for Summ. J. ("Maisto Decl."), Ex. G, 1999 Long-Term Performance Plan, at 9, ECF No. 60.)

Section 13(b) of the Performance Plan further provides that if a Participant "fails to comply with the provisions of [Section 13(a)] prior to, or during the Rescission Period, then any exercise, payment or delivery may be rescinded within two years after such exercise, payment or delivery." (*Id.* at 10.)

Similarly, the various EAAs executed by Defendant during his employment reiterate that "IBM may cancel, modify, rescind, suspend, withhold or otherwise limit or restrict [the] Award[s] in accordance with the terms of the Plan, including, without limitation, canceling or rescinding this Award if [the Participant] render[s] services for a competitor prior to, or during the Rescission Period." (Def.'s 56.1 Reply ¶ 13.) Under the terms of the EAAs, the scope of the Rescission Period is defined as twelve months. (*Id.*)

In June of 2013, the RSUs awarded to Defendant in June of 2009, 2010, 2011, and 2012 vested and were released into Defendant's Morgan Stanley Smith Barney account. (*Id.* ¶¶ 17–20.) As a result, Defendant realized gains totaling $112,260.81. (*Id.* ¶ 21.)

Subsequently, Defendant voluntarily resigned from IBM on March 31, 2014. (*Id.* ¶ 23.) On April 7, 2014—roughly one week after his resignation from IBM—Defendant became employed by Computer Science Corporation ("CSC") as Vice President, General Manager, and Managing Director for its Australia/New Zealand Region. (*Id.* ¶ 24.) CSC is an information technology corporation that provides services including application management, infrastructure, business consulting, technology and systems integration and enterprise resource planning to clients in the banking, healthcare, and insurance industries. (*Id.* ¶ 25.)

In connection with his employment for CSC, Defendant accepted the written terms of an offer letter dated February 27, 2014 (the "Offer Letter"). (*Id.* ¶ 33.) This Offer Letter included a

non-compete provision, under which Defendant agreed that he "would not compete with CSC by joining IBM." (*Id.* ¶ 37, Maisto Decl., Ex. O, Offer Letter, at 2.) Further, the Offer Letter contained an indemnification provision, stating that "CSC will indemnify [Defendant] for any loss in IBM equity value resulting from violation of [his] non-competition agreement with IBM." (*Id.* ¶ 35.)

II. Procedural Background

Plaintiff initiated this action by filing the Complaint on October 09, 2015, seeking to enforce the terms of the contract and rescind the aforementioned pecuniary gains awarded to Defendant. Specifically, Plaintiff argues that CSC and IBM are competitors, making Defendant's employment with CSC a "detrimental activity" under the terms of the Plan. (Compl. ¶¶ 36–37, ECF No. 1.)

On February 24, 2016, this Court issued a discovery plan and referred this case to Magistrate Judge Lisa Margaret Smith. (Civil Case Discovery Plan and Scheduling Order, ECF No. 25; Order Referring Case to Magistrate Judge, ECF No. 24.) Shortly thereafter, Defendant served his first set of interrogatories and requests for production of documents, which included "requests for all documents relating to Defendant's employment with IBM, Defendant's departure from IBM, and documents relating to Defendant's defenses." *IBM v. Naganayagam*, No. 15-CV-7991(NSR)(LMS), slip op. at 2 (S.D.N.Y. Dec. 09, 2016). IBM produced certain documents, but otherwise broadly retorted that the document requests were "vague, ambiguous, unduly burdensome and overbroad." *Id.*

In June of 2016, Defendant was deposed by Plaintiff's counsel. (Decl. of Justin V. Sumner in Opp. to Pl.'s Mot. for Summ. J. ("Sumner Decl."), Ex. C, Nagaseelan Dep., June 29,

2016, ECF No. 63.) During his deposition, Defendant described working on "strategic business paper[s]" in which IBM identified their marketplace competitors during his employ at IBM. (*Id.* at 101:4-25.) Defendant claimed these strategic plans omitted any mention of CSC as an IBM competitor in Australia and New Zealand. *Id.* While Defendant admitted he did not possess these documents, he testified to their existence and asserted that they are in IBM's possession. (*Id.*)

In July of 2016, Defendant's counsel deposed IBM employee Lisa Caldwell. (Sumner Decl., Ex. H, Lisa Caldwell Dep., July 11, 2016.) During her deposition, Caldwell testified that while she was "sure" she had sent and received emails regarding Defendant's departure from IBM, no "hold" was ever placed on her emails or other documents. (*Id.* at 27:8–28:22.) Similarly, during a deposition held on July 26, 2016, another IBM employee—Sudhir Mattoo, the Human Resources Leader in Defendant's division at IBM—testified that he was never asked to retain emails he sent or received about Defendant's departure from IBM. (Sumner Decl., Ex. F, Sudhir Mattoo Dep. 43:3-7, July 26, 2016.)

On August 4, 2016, Plaintiff submitted a letter to this Court seeking leave to file a motion for summary judgment. (ECF No. 33.) The very next day, Defendant's counsel indicated their intention to proceed with a motion for spoliation sanctions relating to IBM's alleged failure to preserve e-mails relevant to the present litigation. (ECF No. 34.)

On August 29, 2016, Defendant requested that Plaintiff produce all documents that evidence, relate, or refer to: "(1) IBM's strategic business plans for the Australia and New Zealand markets between January 1, 2013 and June 1, 2015, (2) companies IBM identified as competitors for the Australia and New Zealand markets between January 1, 2013 and June 1, 2015, (3) [Defendant's] defense that CSC is not a competitor of IBM for the purposes of IBM's

Long Term Performance Plan." *Naganayagam*, 15-CV-7991(NSR)(LMS), slip op. at 3 (internal quotation marks omitted). IBM objected to the request for production, arguing that Defendant's request was untimely, disproportionate to the needs of the case, and sought the production of privileged, highly confidential and proprietary material. *Id.*

On October 31, 2016, Defendant filed a motion to compel production of "IBM's strategic plans for Australia and New Zealand, e-mails related to Defendant's departure from IBM that were referenced in Lisa Caldwell's deposition, a list of Defendant's accounts, and Defendant's own e-mails from the course of his employment at IBM." *Id.* at 5. Plaintiff filed an opposition to the motion to compel reiterating its aforementioned objections and arguing that based on the testimony of the deponents and an apparent concession of defense counsel during a prior conference, it was settled that IBM and CSC are competitors—rendering the requested material irrelevant. *Id.* at 5–6.

Judge Smith issued an Opinion and Order on December 9, 2016, denying Defendant's request to compel the production of both his own emails and client account information as well as Lisa Caldwell's emails, finding that Defendant had failed to establish the relevance of these materials. However, Judge Smith ruled that Plaintiff was required to produce the strategic plans generated by IBM delineating their competitors. *Id.* at 9.

In a letter dated December 30, 2016, Plaintiff's counsel informed Magistrate Judge Smith that despite diligent efforts, IBM was unable to locate the strategy plans described by Defendant in his deposition. (Pl.'s Disc. Resp. to Decision and Order ("Pl.'s Disco Resp."), ECF. No. 57). Plaintiff further asserted that neither Lisa Caldwell—Defendant's immediate supervisor during

his employment at IBM—nor Randy Walker—the IBM executive heading the global Asia Pacific business—had any recollection of such strategy plans. *Id.*

Plaintiff filed the present motion for summary judgment on January 20, 2017 (ECF No. 58.) On January 27, 2017, Defendant filed a cross-motion for spoliation sanctions. (ECF No. 70.) The Court now considers each motion in turn.

## SPOLIATION

Defendant requests that the Court issue an adverse inference and impose other sanctions against Plaintiff for spoliation of electronically stored information ("ESI"), including emails relating to Defendant's departure from IBM and other internal documents. Specifically, Defendant asks this Court to enter an order "(1) establishing that, at the time of [Defendant's] departure from IBM, IBM did not view [CSC] as a competitor of IBM in the Australia/ New Zealand market; [and] (2) requiring IBM to reimburse [Plaintiff] for the costs, including attorneys' fees incurred in making [the present] Motion." (Def.'s Mem. Supp. of Mot. Spoliation Sanctions ("Def.'s Mot. Spoliation") at 1, ECF No. 75.) Plaintiff opposes Defendant's motion, arguing that Defendant has provided no evidence of spoliation and has failed to establish the relevance of the allegedly spoliated evidence. (Pl.'s Mem. in Opp'n to Mot. for Spoliation Sanctions ("Pl.'s Opp'n") at 1–2, ECF No. 73.)

The Court finds that Defendant has not established a claim of spoliation and that sanctions against Plaintiff are unwarranted.

### I. Applicable Law

"Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *In re*

*Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 148 (2d Cir. 2008)(internal quotation marks omitted). Typically, to establish a claim for spoliation sanctions, a moving party must show "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Kravtsov v. Town of Greenburg*, No. 10-CV-3142 (CS), 2012 WL 2719663, at *5 (S.D.N.Y. July 9, 2012) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)). Notably, a finding of negligence or gross negligence is sufficient to satisfy the "culpable state of mind" requirement for spoliation under Second Circuit precedent. *See Residential Funding*, 306 F.3d at 108.

As of December 1, 2015, however, Federal Rule of Civil Procedure 37(e) went into effect, thereby impacting when a court may impose sanctions for the loss or destruction of electronically stored information ("ESI"). *Rhoda v. Rhoda*, No. 14-CV-6740 (CM), 2017 WL 4712419, at *2 (S.D.N.Y. Oct. 3, 2017). Specifically,

> "The Advisory Committee Notes on section (e)(2) of the new Rule . . . make clear that the new Rule 37 rejects cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F. 3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of [mere] negligence or gross negligence. In other words, the new Rule 37(e) overrules Second Circuit precedent on the question of what state of mind is sufficiently culpable to warrant an adverse inference instruction when electronically stored evidence is missing."

*Id.* (quoting *Thomas v. Butkiewicus*, No. 3:13-CV-747 (JCH), 2016 WL 1718368, at *7 (D. Conn. Apr. 29, 2016).

"Now . . . a Court may not issue an adverse inference instruction unless the Court finds 'that the party acted with the intent to deprive another party of the information's use in the litigation.'" *Best Payphones, Inc. v. City of New York*, No. 1-CV-3924 (JG)(VMS), 2016 WL 792396, at *4 (E.D.N.Y. Feb. 26, 2016) (quoting Fed. R. Civ. P. 37(e)(2)). This new standard for adverse inferences in the context of ESI was "developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for loss," whereas the *negligent* loss of such evidence does not. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Indeed, as the Advisory Committee Notes for Rule 37 elaborate, "[i]nformation lost through negligence may have been favorable to either party, including the party that lost it, and inferring that it was unfavorable to that party may tip the balance at trial in ways the lost information never would have." *Id.*

Rule 37(e) does, however, permit courts to impose less severe sanctions or curative measures if: (1) ESI is lost "because a party failed to take reasonable steps to preserve it," (2) the ESI "cannot be restored or replaced through additional discovery," and (3) the court finds "prejudice to another party from the loss of the information." *Id.* Even once these requirements are satisfied, a court may only employ measures "no greater than necessary to cure the prejudice." Fed. R. Civ. P 37(e).

9

Although the more lenient sanctions standard under Rule 37(e) did not go into effect until *after* Plaintiff filed the Complaint in the present action,[2] the amended Rule 37(e) can apply retroactively. Indeed, Chief Justice Roberts included an Order when transmitting the new Rule to Congress explaining that "the foregoing amendment to Federal Rules of Civil Procedure shall take effect on December 1, 2015, and shall govern . . . *insofar as just and practicable*, all proceedings then pending." *Rhoda*, 2017 WL 4712419, at *2 (quoting 2015 U.S. Order 0017).

This Supreme Court Order "create[d] a presumption that a new rule governs pending proceedings *unless* its application would be unjust or impracticable." *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 496 (S.D.N.Y. 2016); *see also Rhoda*, 2017 WL 4712419, *2 ("[A] Court must apply the new version of Rule 37(e) unless, as a preliminary matter, it concludes that it would be unjust or impracticable to do so.").

Here, the Court finds that it would be neither unjust nor impracticable to apply the new version of Rule 37(e). Although the Complaint was filed two months prior to the effective date of the new Rule, the issue of spoliation did not arise in the present action until July of 2016— well after the enactment of the new Rule. Further, the present motion for spoliation sanctions was fully briefed and submitted in January of 2017 (ECF No. 70), more than a full year after the new Rule came into effect. Both parties, therefore, had ample opportunity to brief the spoliation issue under the new Rule.

Moreover, the application of the new Rule to the present action would not meaningfully prejudice Plaintiff nor Defendant. With regard to Plaintiff, "because the amendment [to Rule 37(e)] is in some respects more lenient as to the sanctions that can be imposed for violation of

---

[2] Plaintiff filed the Complaint on October 09, 2015—nearly two months prior to the effective date of Rule 37(e). (ECF No. 1).

the preservation obligation, there is no inequity in applying it [retroactively]." *CAT3*, 164 F. Supp. 3d at 496. With regard to Defendant, the new Rule does not preclude Mr. Naganayagam from pursuing other avenues of relief against IBM's alleged *negligent* spoliation of evidence; namely, less severe sanctions. *See* Fed. R. Civ. P. 37(e). This Court, therefore, finds the spoliation standards for ESI under Rule 37(e) applicable in the present action.

## II. Discussion

As an initial matter, amended Rule 37(e) only allows for adverse inference sanctions where the non-movant acted *intentionally* to deprive another party use of the ESI during litigation. Fed. R. Civ. P. 37(e). Even assuming that Plaintiff did fail to preserve relevant evidence, Defendant merely alleges that Plaintiff acted *negligently* rather than *intentionally*. (Def.'s Mot. Spoliation, at 1.) Accordingly, this Court finds that Defendant is not entitled to an adverse inference under Rule 37(e).

This Court also finds that less severe spoliation sanctions are similarly unwarranted. Rule 37(e) permits courts to impose sanctions other than adverse inferences where ESI is lost "because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. Rule 37(e). Such sanctions may only be imposed, however, "upon finding prejudice to another party from loss of the information." *Id.*

Defendant has failed to demonstrate that such prejudice exists in the present case. While Rule 37(e) does not necessarily place the burden of proving or disproving prejudice on any particular party, requiring the moving party to prove prejudice may be reasonable in situations where "the content of the lost information is fairly evident, the information [ ] appear[s] to be

unimportant, or the abundance of preserved information [ ] appears sufficient to meet the needs of all parties." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

Here, the content of the allegedly spoliated emails and documents is fairly evident—or could have become evident with relatively little effort—yet Defendant has failed to establish how he has been prejudiced by their alleged loss. During her deposition, Lisa Caldwell, whose emails are at the center of Defendant's spoliation claims, merely stated that she had sent and received e-mail correspondence relating to Defendant's departure from IBM. (Sumner Decl., Ex. H, Lisa Caldwell Dep. 27:8–28:22). As United States Magistrate Judge Lisa Margaret Smith aptly noted in her December 9, 2016 Decision and Order, "[d]espite Defendant's ability to depose Caldwell regarding the content of these e-mails, Defendant has failed to provide the Court with any deposition testimony by Caldwell to the effect that the e-mails contained discussions of whether IBM and CSC are competitors." *Naganayagam*, No. 15-CV-7991 (NSR) (LMS), slip op. at 10. Without such testimony, Defendant fails to establish how or why the alleged spoliation of these emails is prejudicial to him. Thus, the imposition of spoliation sanctions in connection with these emails is unwarranted.

Defendant similarly fails to show how the alleged spoliation of his own emails and account lists from his time as an IBM employee prejudices him. Defendant claims that the list of his former IBM accounts "would show whether IBM and CSC compete under the Plan by allowing the parties to examine whether or not these client accounts were serviced or could be serviced by CSC." (Def.'s Mot. Spoliation, at 10.) The Plan at issue in this case, however, is far broader than Defendant suggests; Plaintiff need not show that CSC competed with IBM on Defendant's specific accounts to be entitled to rescission. Rather, the Plan allows Plaintiff to

rescind Defendant's awards for "the rendering of services to any organization . . . which is or becomes competitive with [IBM]." (Maisto Decl., Ex. G, 1999 Long-Term Performance Plan, at 9.) The relevant question in this action is, therefore, whether CSC and IBM are competitors generally. Information regarding Defendant's specific accounts is immaterial to this action and this Court finds that Defendant suffered from no prejudice from its absence.

Likewise, Defendant also fails to establish that the alleged spoliation of IBM's "strategic plans" for New Zealand and Australia prejudiced him in any way. Just as Plaintiff need not demonstrate that CSC serviced Defendant's former IBM clients, neither must Plaintiff show that CSC and IBM are competitors in the New Zealand and Australia markets specifically. Even if such plans did indeed exist, Defendant nevertheless fails to show how they would be relevant to Plaintiff's broader breach of contract claim.

Because Defendant was not prejudiced by the absence of the allegedly spoliated evidence, Defendant's motion for spoliation sanctions is denied.

## SUMMARY JUDGMENT

The Court next considers Plaintiff's motion for summary judgment. Plaintiff contends that Defendant has failed to raise any genuine issue of material fact regarding his alleged breach of the Plan and EAAs. Defendant argues that the language of the Plan is susceptible to different interpretations and that a factual dispute exists as to whether Defendant's subsequent employment with CSC entitles Plaintiff to rescind his equity awards.

This Court finds that there is no genuine dispute of material fact regarding Defendant's breach of the Plan and EAAs, and grants Plaintiff's motion for summary judgment.

13

## I. Standard on Motion for Summary Judgment

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation and quotation marks omitted).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summ. order). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted). The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In the context of contract disputes, summary judgment may be granted "when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir.

14

2008). Whether the terms of a contract are ambiguous or unambiguous is a question of law for the court to decide. *Revson v. Clinique & Clinique, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000). Even where a court finds the contractual language ambiguous, summary judgment may nonetheless be appropriate "if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the non-moving party's case." *Topps*, 526 F.3d at 68.

## II. Discussion

### *A. Breach of Contract*

This Court finds that Plaintiff has satisfied its burden of showing an absence of a genuine dispute of material fact regarding Defendant's breach of the contract. To establish a *prima facie* case for breach of contract under New York law, a plaintiff must plead and prove "(1) the existence of an agreement, (2) adequate performance of the contract by the claimant, (3) breach of contract by the accused, and (4) damages." *Int'l Bus. Machines Corp. v. United Microelectronics Corp.*, No. 16-CV-5270, 2017 WL 3972515, at *6 (S.D.N.Y. Sept. 7, 2017) (quoting *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 318 (S.D.N.Y. 2010)). The party asserting a breach of contract claim bears the burden proof as to all elements. *Barton Grp., Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 498 (S.D.N.Y. 2011).

Here, there is no dispute that Defendant received equity awards under Plaintiff's Long-Term Performance Plan and various EAAs executed throughout the course of his employment with IBM. (Def.'s 56.1 Reply ¶ 21.) Neither is it disputed that Defendant received gains equaling $112,260.81 as a result of these agreements—which Plaintiff has since sought to rescind and Defendant has refused to return. *Id.* Plaintiff, therefore, has successfully established (1) the

existence of an agreement, (2) performance of its obligations under the agreement, and (3) possible damages. The only remaining issue is whether Defendant's subsequent employment with CSC and refusal to return his equity awards constitutes a breach under the terms of the Plan.

This Court finds that it does.

Section 13(b) of the Plan entitles Plaintiff to cancel or rescind awards where the beneficiary engages in any "Detrimental Activity." (Maisto Decl., Ex. G, 1999 Long-Term Performance Plan, at 9.) The agreement defines "Detrimental Activity" as including "the rendering of services for any organization or engaging directly or indirectly in any business which is or becomes competitive with [IBM], or which organization or business, or the rendering of services to such organization or business, is or becomes otherwise prejudicial to or in conflict with the interests of the Company." *Id.*

Defendant contends that the scope of the Plan's non-compete language is susceptible to different interpretations. Specifically, Defendant maintains that while Plaintiff characterizes the provision as broad and all inclusive, the term "competitive with" is undefined and could be read more narrowly. (Def.'s Mem. Opp. Pl.'s Mot. Summ. J. ("Def.'s Opp.") at 15, ECF No. 64.) The relevant inquiry, Defendant argues, should not be whether CSC and IBM are competitors generally, but rather whether "CSC and IBM compete for the [specific] services that [Defendant] rendered in the Australia/New Zealand market while he was employed at IBM." (*Id.*) Defendant asserts that this alleged ambiguity in the contractual language creates an issue of fact that may not be resolved through summary judgment. (*Id.*)

Plaintiff counters that "Detrimental Activity" is an unambiguously defined term in the contract as "competition in the broadest sense with no service limitations or geographic carve

outs." (Pl.'s Reply Mem. Supp. Mot. Summ. J., at 6, ECF No. 66.) This Court agrees.

The language of the Plan and subsequent EAAs executed between Plaintiff and Defendant is clear and unambiguous; *any* competitive relationship between CSC and IBM suffices to warrant rescission of Defendant's equity awards. The Plan's language is broad and evinces an intention to cover the rendering of *any* services to an entity that is "competitive with" or otherwise "prejudicial to" or "in conflict with" the interests of IBM. The Plan does not require the participant's specific services for such companies to be detrimental to IBM. Rather, the generally competitive relationship between IBM and the new employer is enough to warrant rescission of awards.

Presently, there is no dispute that IBM and CSC compete. During his deposition, Defendant himself testified that CSC and IBM are, in fact, competitors "for some services." (Maisto Decl., Ex. D, Nayagam Dep. 55:20-25.) Similarly, defense counsel conceded during a conference before this Court that IBM and CSC are competitors in many areas. (Maisto Decl. Ex. N, Sept. 21, 2016 Tr. pp. 18-19.) Indeed, CSC's employment letter to Defendant includes a non-compete provision that specifically names IBM as a competitor. (Maisto Decl. Ex. O.) Because it is undisputed that CSC and IBM are competitors in many respects, there are no triable issues of fact in this case. Defendant's subsequent employment with IBM's competitor, regardless of the specific functions Defendant performed for IBM or CSC, constitutes "detrimental activity" under the Plan. Accordingly, Plaintiff has meet its burden of demonstrating that Defendant indisputably breached their contractual agreement.

### B. *Enforceability of the Contract*

Having found that Defendant indisputably breached his agreement with IBM, the Court

now turns to the enforceability of the Plan's non-compete provisions. "New York courts have generally concluded that restrictive covenants in employment contracts—such as non-compete, non-solicitation, and non-recruitment clauses—must be subjected to heightened judicial scrutiny since they potentially impinge on individual agency and an employee's ability to make a living." *Oliver Wyman, Inc. v. Eielson*, No. 15-CV-5305 (RJS), 2017 WL 4403312, at *5 (S.D.N.Y. Sept. 29, 2017). One notable exception to this rigorous scrutiny, however, is the employee choice doctrine. *Int'l Bus. Machines Corp. v. Smadi*, No. 14-CV-4694 (VB), 2015 WL 862212, at *3 (S.D.N.Y. Mar. 2, 2015).

Under the employee choice doctrine, "New York courts will enforce a restrictive covenant without regard to its reasonableness if the employee has been afforded the choice between not competing (and thereby preserving his benefits) or competing (and thereby risking forfeiture)." *Id.* (citing *Lucente v. Int'l Bus. Machines Corp.*, 301 F.3d 243, 254 (2d Cir. 2002). To be applicable, the employee must have left his employment voluntarily and his former employer must have demonstrated its "continued willingness to employ the party who covenanted not to compete." *Id.*

Here, there is no dispute that Defendant "voluntarily resigned from IBM on or about March 31, 2014." (Def.'s 56.1 Reply ¶ 23.) Additionally, Defendant himself testified during his deposition that Randy Walker, his supervisor at IBM, expressed a desire to match CSC's offer and keep Defendant at IBM. (Sumner Decl., Ex. C, Nagaseelan Dep. 86:15–87:11.) IBM's willingness—even eagerness—to continue employing Defendant is clear. Thus, Defendant was clearly "afforded the choice of continuing to receive awards by refraining from competing with IBM, or forfeiting the monetary value of Awards by refraining from competing with IBM, or

18

forfeiting the monetary value of the awards by competing with IBM." *Smadi*, 2015 WL 862212, at *3. As such, the rescission of Defendant's awards is permitted under the employee choice doctrine. Because Plaintiff has established a breach of an existing, enforceable agreement, this Court grants summary judgment in favor of Plaintiff.

### C. Attorneys' Fees

Lastly, the Court turns to the issue of whether Plaintiff, having prevailed on its motion for summary judgment, is entitled to attorneys' fees. "Although the general rule in American courts is that the prevailing plaintiff must bear his own fees in a contract action," *Parker Hannifin Corporation v. North Sound Properties*, No. 10-CV-6359 (MHD), 2013 WL 3527761, at *1 (S.D.N.Y. July 12, 2013), "[u]nder New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008).

Here, Plaintiff is entitled to reasonable attorneys' fees. Section 15(f) of the Plan states that "[i]n the event that a Participant or the Company brings an action to enforce the terms of the Plan or any Award Agreement and the Company prevails, the Participant shall pay all costs and expenses incurred by the Company in connection with that action, including reasonable attorneys' fees." (Maisto Decl., Ex. G, Long Term Performance Plan, at 11.) Thus, the Plan contains a clear and unambiguous fee-shifting provision, the likes of which have been found valid and enforceable under New York law. *See, e.g., Paker Hannifin Corp. v. N. Sound Properties*, No. 10-CV-6359 (MHD), 2013 WL 1932109, at *10 (S.D.N.Y. May 8, 2013). This Court, therefore, finds that Plaintiff is entitled to recover reasonable attorney's fees associated

with this action.

## CONCLUSION

For the foregoing reasons, Defendant's motion for spoliation sanctions is DENIED and Plaintiff's motion for summary judgment is GRANTED.

The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 58 and 70. Plaintiff is directed to provide the Court and opposing counsel an affidavit with contemporaneous time records in support of its request for attorneys' fees. The parties should notify the Court on or before December 11, 2017 if they have reached an agreement regarding attorneys' fees. If the parties are unable to reach an agreement by that date, the matter will be referred to the Honorable Lisa Margaret Smith for a hearing.

Dated: November 21, 2017
White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge